871 So.2d 845 (2003)
WERNER COMPANY
v.
Teresa WILLIAMS.
2010925.
Court of Civil Appeals of Alabama.
April 18, 2003.
Certiorari Denied August 15, 2003.
*848 Paula I. Cobia, Anniston, for appellant.
Robert W. Lee, Jr., and Wendy M. Thornton of Lee & Thornton, P.C., Birmingham; and Patrick P. Hughes, Anniston, for appellee.
Alabama Supreme Court 1021243.
CRAWLEY, Judge.
Teresa Williams ("the worker") was employed at Werner Company ("the company"), *849 a manufacturer of ladders, as a materials handler. She sued the company for workers' compensation benefits, alleging that she had been injured at work on November 30, 1998. After a trial, the trial court entered a judgment finding the worker 100% permanently and totally disabled and awarding the worker benefits and a lump-sum attorney fee. The company appeals.

The Facts as Developed at Trial
The worker testified that her job required her to collect parts as they were needed for the persons assembling the ladders on the assembly line. According to the worker, on November 30, 1998, she was retrieving barrels filled with parts called "spreaders." The spreaders were in barrels and the barrels were stored on pallets. The worker testified that she was moving one of the barrels toward her when "the pallet broke and the spreaders went forward along with [her] shoulder."[1] She said that she repeatedly reported the incident to her supervisor, Mark Bruce, but that he did not file a first report of injury. She said she continued to work despite her pain until December 28, 1998; on that date she told her new supervisor, Victor Rodriguez, of her injury, and he sent her to the emergency room at Stringfellow Hospital. The first report of injury form was completed on December 28, 1998.
After reporting to the emergency room, the worker was referred to Dr. Charlie Williams. Dr. Williams determined that the worker had strained her shoulder. He prescribed pain medications; he also limited her to two hours of work with her right arm, restricted lifting to no more than 10 pounds, and ordered that she not engage in work involving repetitive motion and that she do no work requiring her to raise her right arm above shoulder-level. At her follow-up appointment on December 30, the worker continued to complain of pain; Dr. Williams's office notes indicate that he diagnosed tendinitis and bursitis of the right shoulder. Dr. Williams injected the worker's shoulder with pain medication, continued her restrictions, and ordered one week of physical therapy.
The worker returned to Dr. Williams on January 6, 1999, with continued complaints of pain. Dr. Williams's office notes indicate that he was puzzled that the worker's pain, which she described as 10 on a scale of 1 to 10, had continued despite her being placed on light duty work and after the pain injection on December 30. He further restricted her work by requiring that she do no work with her right arm. He also referred her to Dr. Willie Stokes, an orthopedic surgeon, for further evaluation.
Dr. Stokes first saw the worker on January 7, 1999. He agreed with Dr. Williams's assessment of the worker's injury as tendinitis. According to Dr. Stokes's deposition testimony, an injury like the worker's usually develops as a result of some trauma or lifting activity, but the injury is usually resolved within four weeks by simply resting the injured joint. Dr. Stokes explained that tendinitis can induce subacromial bursitis, which is an inflammation of the bursa. He said that he treated the worker with another injection of pain medication in her shoulder, and he then released her to return to work with the restriction that she do no lifting of objects greater than 20 pounds.
*850 The worker returned to Dr. Stokes on January 14, 1999, still complaining of severe pain. Dr. Stokes then ordered an MRI of her shoulder, which, he said, was to rule out a possible tear in the rotator cuff. Bobbie Hammonds, the occupational nurse at the company, telephoned Dr. Stokes on January 19, 1999, before the MRI had been performed, to report that the worker, who had been assigned to a light-duty job, continued to complain of pain. Dr. Stokes indicated to Hammonds that the worker either had an underlying problem that had yet to be diagnosed or that she was malingering. He ordered that the worker not return to work until after her MRI was performed.
The worker underwent an MRI on February 6, 1999. According to the report from the radiologist and Dr. Stokes's deposition testimony, the MRI showed no abnormalities in any of the structures of the shoulder. Dr. Stokes concluded, based on his review of the MRI and on the worker's failure to heal from what he determined to be a minor case of tendinitis, that the worker should be discharged from treatment and released to work without restrictions.
The worker, however, continued to complain that she could not work because of her pain. She said in her deposition that she reported to Jerry Lowe, the manager of the company's human resources division, that she was still in pain and that she could not work despite the fact that Dr. Stokes had released her with no restrictions. She said that he told her to see her own physician. The worker's testimony is supported by a document in the record, written by Lowe, indicating that he told the worker that the company's workers' compensation insurance carrier had denied her request for work-related-injury leave and that she would need to get a release from her personal physician to return to work.
The worker then went to see Dr. C. Herbert McCrimmon, an orthopedic surgeon she had seen in the past. Dr. McCrimmon examined the worker on February 15, 1999, February 23, 1999, and March 3, 1999. Dr. McCrimmon's office notes indicate that he was informed that Dr. Stokes had seen the worker and that she was told to check out her medical records and to bring them to her next appointment with Dr. McCrimmon, which she apparently did. After reviewing her MRI, Dr. McCrimmon concluded that the worker may need arthroscopic surgery, so he referred her to his partner, Dr. Duane Tippets, for evaluation and possible surgery.
Dr. Tippets determined that the worker suffered from impingement and recommended an arthroscopic evaluation of her shoulder with possible subacromial decompression. The worker underwent surgery on March 23, 1999. According to Dr. Tippets, the surgery went well, but the worker continued to have pain. He had the worker attempt physical therapy to improve motion and strength.
The worker began physical therapy with Andrea Barnes at David Wilhoite and Associates on April 13, 1999, and reported for a total of six appointments. According to her physical therapy records, the worker communicated to Barnes on April 28, 1999, that she was pain-free and that she wished to discontinue therapy at that time. The records reflect that the worker stated that she could carry a laundry basket of wet clothes, reach overhead to hang clothes to dry, pick up and carry a one-gallon jug of milk, and reach overhead to the top shelf while grocery shopping. When questioned about these comments, the worker testified that she had reported being able to do all those things with her left arm. Barnes *851 discharged the worker from therapy on April 28, 1999.
However, when the worker returned to Dr. Tippets's office for a follow-up appointment on May 11, 1999, the worker reported having increased motion but persistent pain. He also noted that she complained of feeling unstable. Dr. Tippets's office notes reflect that a review of photographs of the worker's surgery revealed a partial detachment of her anterior glenoidale labrum. He suggested in his office notes that the worker's reports of continued pain might require an open-shoulder reconstruction, but noted that he encouraged her to continue with therapy three times per week for another four weeks. Dr. Tippets's office notes do not indicate that the worker informed him that she had been discharged from therapy at her own request. One month later, on June 11, 1999, Dr. Tippets scheduled the worker for a shoulder reconstruction on June 30, 1999.
The operative record of the June 30, 1999, surgery indicates that the worker had "some definite anterior instability but without definite dislocation." In addition, the record states that "the anterior capsule was very attenuated and stretched out." According to the record, once all aspects of the surgery were completed, "this resulted in an exceedingly stable reconstruction." Again, after a few weeks, Dr. Tippets recommended physical therapy.
The worker began physical therapy at the Northeast Alabama Regional Medical Center. According to the records admitted at trial, the worker began therapy on July 19, 1999. She attended only two other appointmentson July 23 and August 5. She missed the other six scheduled appointments and was discharged on August 12, 1999, for failing to attend. The records reflect that she reported having a personal situation that prevented her from attending therapy. Dr. Tippets's office notes reflect that the worker had reported that she had lost her job and her insurance and that she was not getting paid. However, the worker was employed at the company until November 21, 2000, and her health insurance was in effect until November 30, 2000.
Dr. Tippets testified that he assigned the worker permanent restrictions in July 2000; specifically he prohibited lifting items weighing over five pounds and any overhead work with the right arm. When questioned about when the worker had reached maximum medical improvement ("MMI"), he noted that the injury was, at that time, not considered work-related. However, he said the worker, who had had periods of increased rotation and flexion and had also had setbacks, was, in his opinion, "as good as she was going to get" when he saw her on July 7, 2000. He noted that his impression was that she was not going to get better.
Dr. Tippets stated that, based on the worker's report of her injury at work, he felt it was possible that the worker's condition was work-related. He also said that the worker's job would certainly have contributed to her symptoms if the worker had had an existing impingement. He also testified that he did not think the worker was 100% disabled.
In December 2000, after three failed attempts, the worker was awarded Social Security disability benefits. The records disclose that she received disability on the basis of her mild mental retardation, "a frozen right shoulder," and the limitations Dr. Tippets placed on her lifting abilities. Those records contain the report of Dr. Richard Summerlin, a psychologist who performed diagnostic testing on the worker. The document from the Social Security Administration awarding the worker disability benefits indicates that testing revealed her IQ to be 68. The trial court *852 indicated that it had reviewed the records of the Social Security Administration in making its decision.
The worker was also evaluated by Dr. Alan Blotcky, a clinical psychologist, who, after testing the worker, concluded that the worker was mildly mentally retarded with a full-scale IQ of 66. He concluded that the worker could read on a 3.7 grade level, spell on a 2.4 grade level, and perform math on a 2.1 grade level. He also determined that the worker suffered from severe depression, which, he said, would impact her ability to concentrate; to understand, carry out, and remember instructions; to perform complex or varied job-related tasks; and to respond to customary work-related pressures.
Jo Spradling, a vocational rehabilitation counselor, testified concerning the worker's loss of access to the job market. Spradling testified that she had reviewed the worker's medical records from Dr. Tippets and the report of Dr. Blotcky, and had conducted her own testing and had interviewed the worker. She opined that the worker was indeed mildly mentally retarded and noted that her low intellectual capacity, her medical restrictions, and her depression and its effect on her ability to concentrate and carry out job-related tasks would prevent her from finding gainful employment. She concluded that the worker was 100% vocationally disabled.

Standard of Review
Our review of this case is governed by the Workers' Compensation Act, which states, in pertinent part: "In reviewing pure findings of fact, the finding of the circuit court shall not be reversed if that finding is supported by substantial evidence." Ala.Code 1975, § 25-5-81(e)(2). Therefore, this court "will view the facts in the light most favorable to the findings of the trial court." Whitsett v. BAMSI, Inc., 652 So.2d 287, 290 (Ala.Civ. App.1994), overruled on other grounds, Ex parte Trinity Indus., Inc., 680 So.2d 262, 269 (Ala.1996). Further, the trial court's finding of fact is supported by substantial evidence if it is "supported by `evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.'" Ex parte Trinity Indus., 680 So.2d at 269 (quoting West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989), and citing § 12-21-12(d)). Our review of legal issues is without a presumption of correctness. Ala.Code 1975, § 25-5-81(e)(1); see also Ex parte Trinity Indus., 680 So.2d at 268.

Whether the Trial Court's Judgment Complies with Ala.Code 1975, § 25-5-88
At the outset, we note that the company indicates that it believes the trial court, in its judgment, has made insufficient findings under Ala.Code 1975, § 25-5-88, or that the findings are, if not insufficient, at the least, meager and omissive. The company argues that the trial court's failure to specifically mention several disputed issues and the testimony or documentary evidence on those issues somehow makes the trial court's judgment insufficient under § 25-5-88. The company attacks the trial court's judgment for failing to detail explicitly the numerous medical records and the deposition testimony of Dr. Tippets and Dr. Stokes, for failing to make desired findings on whether the worker was overstating her pain and whether she was feigning her inability to read, and for failing to reference the testimony of Jerry Lowe on issues regarding notice of the worker's injury, the worker's ability to read, and her work performance.
The trial court is not required by § 25-5-88 to comment on every item of *853 evidence, each word of testimony, and every line of every deposition offered in evidence. As we have previously stated, "[a]lthough § 25-5-88 ... requires a `statement of the law and facts and conclusions as determined by [the trial] judge,' we are unpersuaded that that Code section compels the detailed findings [the company] would have the trial court make." Bostrom Seating, Inc. v. Adderhold, 852 So.2d 784, 793-74 (Ala.Civ.App.2002) (quoting § 25-5-88). To the extent some of the findings of the trial court may be meager or omissive, we note that a reversal is not required. Instead, we merely conduct the same review as we would of more specific factual findings to determine whether the ultimate finding made by the trial court is supported by substantial evidence. See Cockrum v. Dunlop Tire Corp., 808 So.2d 58, 59 (Ala.Civ.App.2001).

The Company's Arguments
The company argues that the trial court could not have determined that the worker gave it timely notice of her injury or that she had actually suffered an on-the-job injury because of inconsistencies in the testimony of the worker. The company also argues that the worker's injury is not an accidental injury, but is instead, the company contends, a nonaccidental, cumulative-stress injury. Thus, the company argues, the worker was required to prove, by clear and convincing evidence, that her employment exposed her to a risk materially in excess of the risk to which all persons are exposed. See Ex parte Trinity Indus., 680 So.2d at 269, and Ala.Code 1975, § 25-5-81(c). The company also argues that the worker's injury is to a scheduled member.
The company argues that the worker failed to present either clear and convincing or substantial evidence of medical causation, that the trial court considered inadmissible hearsay contained in records of the Social Security Administration admitted into evidence, and that the trial court unduly relied upon the fact that the worker was receiving Social Security disability benefits. The company further contends that the trial court erred in permitting a continuance for the worker to properly certify medical records before trial. In addition, the company argues that the trial court erred by failing to reopen the case to allow the company to admit a video-surveillance tape the company failed to admit at trial and in failing to consider evidence indicating that the worker had failed to return to work or even to attempt to perform her job. Finally, the company argues that the trial court erred in ordering the company to pay for all of the worker's past and future medical benefits, in failing to properly calculate the worker's weekly wage, and in failing to calculate the present value of the worker's future payments before awarding a lump-sum attorney fee.

Whether the Worker Gave the Required Notice
The company argues that the trial court erred by finding that the worker gave the requisite notice of her injury under Ala.Code 1975, § 25-5-78. That section requires a worker to give an employer written notice of an injury within five days of its occurrence. However, oral notice to a supervisor has typically been held to satisfy the statute, despite the statutory language requiring the notice to be written. See Steele v. General Motors Corp., 705 So.2d 402, 404 (Ala.Civ.App. 1997).
The worker testified that she reported the incident to her immediate supervisor on more than on occasion, beginning on November 30, 1998. As the company points out, the worker did see Lowe, to request to take her perfect-attendance day, only a few days before the first report *854 of injury was filled out on December 28, 1998, and she did not report her injury to him. The worker regularly reported to work during the one-month interval between the date of her injury and the date it was initially reported; she may have worked overtime during that month. Although we understand the company's argument that the worker's conflicting testimony and some of her behavior might cause one to call into question the veracity of her report that she notified her supervisor of her injury, the trial court heard the worker testify and considered the evidence, and it alone is entrusted to resolve the conflicts in that evidence. Hooker Constr., Inc. v. Walker, 825 So.2d 838, 842 (Ala.Civ.App.2001). Although disputed, the evidence at trial supports the trial court's apparent conclusion that the worker reported her injury to her immediate supervisor in a timely manner.

Whether the Injury was Work-Related
Likewise, the worker's testimony concerning exactly how the injury occurred, even though slightly conflicting as mentioned in note 1, is sufficient to support the trial court's conclusion that the worker suffered a work-related injury. In addition, medical testimony indicated that the worker's injury was consistent with an injury caused by trauma to the shoulder as a result of either pushing or pulling. Therefore, we cannot say that the trial court's finding that the worker's injury was work-related was not supported by substantial evidence.

Whether the Injury was "Accidental" or "Nonaccidental" and Whether the Worker Must Prove Causation by Clear and Convincing Evidence
The company argues on appeal that the worker's injury was not caused by an accident, but is instead a nonaccidental, cumulative-stress injury requiring the worker to prove causation by clear and convincing evidence. The company contends that the injury manifested by the worker's experiencing a sharp pain in her shoulder while pushing or pulling a barrel of spreaders is not "accidental" because it is not "an unexpected or unforeseen event, happening suddenly and violently." See Ala.Code 1975, 25-5-1(7); see also Ex parte Trinity Indus., 680 So.2d at 266 n. 3. The company then reasons that the worker must prove that she was exposed to a risk materially in excess of the risk to which other persons are exposed. See Ex parte Trinity Indus., 680 So.2d at 269. From that premise, the company leaps to a conclusion that the worker must prove medical and legal causation by clear and convincing evidence because the injury is a cumulative-stress, or gradual-deterioration, injury. See Ala.Code 1975, § 25-5-81(c).
Our supreme court "has long concluded that if the job caused the injury then the injury was an `accident' within the intent of the [Workers' Compensation] Act." Ex parte Harris, 590 So.2d 285, 286 (Ala.1991). The company is correct in stating that a worker who has suffered a nonaccidental injury must prove that she was exposed to a risk materially in excess of that risk to which persons are exposed every day. Ex parte Trinity Indus., 680 So.2d at 269. However, nothing in the record supports a conclusion that the worker's injury was caused by something other than an accident. The worker was either pushing or pulling or manipulating in some way a heavy barrel of parts that she, as a materials handler, was required to move. A worker "is not required, under the Act, to prove the existence of some violent and unusual event that resulted in his or her injuryif the job caused the injury, then the injury is an accident within the intent of the Act." Ex parte Harris, 590 So.2d at 286. We conclude, as did the *855 trial court, that the worker was injured in a traditional accident.
We also conclude that the evidence at trial does not support the company's argument that the worker's injury was the result of gradual deterioration or cumulative stress. Medical testimony indicated that the injury like the one suffered by the worker could be caused by a fall onto the affected shoulder or by trauma to the shoulder caused by lifting, pushing, or pulling heavy items. Therefore, contrary to the company's argument, the worker was not required to prove causation by clear and convincing evidence.

Whether the Worker's Injury Was to a Scheduled Member
The company argues that the worker's shoulder injury corresponds to an injury to her arm and is, therefore, a scheduled-member injury. Thus, the company concludes, the trial court erred in awarding the worker benefits based upon a percentage of disability because the only way for it to have done so is to apply the now-overruled test first set out in Bell v. Driskill, 282 Ala. 640, 213 So.2d 806 (1968), overruled by Ex parte Drummond, Co., 837 So.2d 831 (Ala.2002). We need not consider whether the overruling of the Bell test impacts this case because an injury to the shoulder is not an injury to the arm. M.R. Thomason & Assoc., Inc. v. Jones, 48 Ala.App. 67, 70, 261 So.2d 899, 902 (Ala. Civ.App.1972); McCarty v. Campbell Plumbing Co., 45 Ala.App. 617, 620, 234 So.2d 895, 897 (Ala.Civ.App.1970). In addition, we note that the worker sought, and was awarded, benefits for permanent total disability; an award of compensation pursuant to the schedule is for permanent partial disability. Therefore, the trial court was not limited, under Ala.Code 1975, § 25-5-57(3)(a), to awarding the amount of compensation due for the loss of an arm.

Whether the Worker Produced Substantial Evidence of Medical Causation
The company argues that the conflicting evidence on whether the worker was malingering (the opinion of Dr. Stokes and Dr. Williams) or whether she was truly injured at work (the opinion of Dr. Tippets, based primarily on the worker's self-report) and the conflicting evidence regarding the worker's desire to recover and her rate of recovery is not sufficient to support the trial court's determination that the worker was 100% permanently and totally disabled. Under the Workers' Compensation Act, a worker is permanently and totally disabled if the worker is "incapacitate[d] ... from working at and being retrained for gainful employment." Ala.Code 1975, § 25-5-57(a)(4)d. A worker is not required to be totally helpless; the worker simply must be unable to perform his or her trade or obtain other gainful employment. Southern Lifestyle Homes v. O'Rear, 628 So.2d 645, 646 (Ala. Civ.App.1993).
As we have previously stated, this court does not reweigh the evidence before the trial court when reviewing its judgment. Bostrom Seating, 852 So.2d at 795. Although we might have resolved the conflicting evidence otherwise, the trial court observed the worker during her testimony and was able to assess her demeanor and determine her credibilitytwo important factors this court is unable to assess. Hooker Constr., Inc. v. Walker, 825 So.2d 838, 842 (Ala.Civ.App.2001). We have consistently held that a trial court may find that a worker has proven medical causation even in the absence of medical testimony to the effect that the worker's injuries resulted from a work-related accident. See Hooker Constr., Inc. v. Walker, 825 So.2d 838, 843 (Ala.Civ.App.2001) (citing Wal-Mart Stores, Inc. v. Kennedy, 799 *856 So.2d 188, 195 (Ala.Civ.App.2001)) (stating that the trial court can consider lay, as well as expert, testimony on the issue of medical causation); Waffle House, Inc. v. Howard, 794 So.2d 1123, 1128-29 (Ala.Civ. App.2000) (same). Accordingly, because a favorable view of the testimony and evidence at trial supports the determination that the worker's physical restrictions, her pain, and her limited intellectual ability together serve to make her 100% permanently and totally disabled, we affirm the trial court's determination of the worker's disability.

Whether the Trial Court Impermissibly Relied on Hearsay Evidence
The company argues that the trial court erred by considering the report of Dr. Richard Summerlin, a psychologist, which was contained in records obtained from the Social Security Administration. Both the company and the worker submitted copies of the worker's Social Security disability file as evidence at trial. Neither party objected to the file; neither party requested that its use be limited in any way; and neither party redacted any material in that file. Accordingly, we do not believe that the company preserved this issue for appeal. See Bostrom Seating, 852 So.2d at 794. Even if any error had been preserved, the admission of and reliance upon Summerlin's report and upon his conclusion that the worker had an IQ of 68 would have been harmless error because that evidence appears to be cumulative evidence concerning the worker's intellectual functioning. See Rule 45, Ala. R.App. P.

Whether the Trial Court "Unduly Relied" on the Worker's Receipt of Social Security Disability Benefits
The company also argues that the trial court unduly relied on the fact that the worker was receiving Social Security disability benefits. The company admits that a trial court may consider the receipt of disability benefits. See Fuqua v. City of Fairhope, 628 So.2d 758, 761 (Ala.Civ.App. 1993) (reversing an award of less than 100% permanent and total disability based, in part, on evidence indicating that the worker received Social Security disability benefits). It then argues that the trial court was not required to do so. The company does not present a legal argument on this issue; instead it chooses again to focus on challenging the trial court's factual determinations based on the conflicting evidence. We find no error in the trial court's consideration of the worker's receipt of disability benefits.

Whether the Trial Court Erred by Granting a Continuance for the Purpose of Allowing the Worker to Certify Medical Records She Intended to Admit as Evidence at Trial
The company argues that the trial court should not have granted a continuance of the original setting of trial for the purpose of allowing the worker to certify medical records she intended to use at trial. The company's argument that the allowing of a continuance somehow "nullifies" Ala.Code 1975, § 25-5-81(f)(4), which requires that copies of medical records to be admitted at trial be provided to the other party 21 days before trial, is, quite frankly, without merit. Whether to grant a continuance is within the discretion of the trial court. Acustar, Inc. v. Guerin, 593 So.2d 1029, 1031 (Ala.Civ.App.1992). The company has not demonstrated that the trial court's granting of a continuance in this case was a misuse of that discretion.

Whether the Trial Court Erred by Failing to Reopen the Case to Allow the Company to Submit a Video-Surveillance Tape the Company Failed to Ad mit at Trial
The company argues that the trial court erred by refusing to reopen the case *857 so that the company could admit as evidence a surveillance videotape of the worker. It cites no law compelling us to reverse the trial court for its failure to "anticipate that the [worker] would lie to the court about the content of the videotape." We will not address this contention, see Rule 28(10), Ala. R.App. P., and Asam v. Devereaux, 686 So.2d 1222, 1224 (Ala.Civ.App.1996) (stating that "[t]his court will address only those issues properly presented and for which supporting authority has been cited" (emphasis added)). We do note, however, that the company's failure to properly present its evidence is certainly not a basis for reversing the judgment of the trial court.

Whether the Trial Court Erred in Failing to Consider Whether the Worker Was Precluded by Ala.Code 1975, §§ 25-5-57(a)(3)e. or 25-5-57(a)(4)d., from Being Awarded Benefits by Virtue of Her Failure to Return to Work or to Accept a Reasonable Accommodation
The company argues that the worker failed to return to work or to accept a reasonable accommodation and that she is therefore precluded from being deemed permanently and totally disabled pursuant to Ala.Code 1975, §§ 25-5-57(a)(3)e. and 25-5-57(a)(4)d. Section 25-5-57(a)(3)e. does require a worker to accept "employment suitable to his or her capacity offered to or procured for him or her" as a prerequisite to receiving benefits for permanent partial disability. Section 25-5-57(a)(4)d. prevents a worker from receiving benefits for permanent and total disability if he or she refuses a reasonable accommodation offered by the company.
The evidence shows that the company sent the worker home on February 22, 1999, with instructions to return to work only upon a "full release" by her personal physician. Dr. Tippets's medical records indicate that, while he had released the worker on some occasions to do light-duty work with only her left arm, he did not give her a "full release." In fact, his records reflect that at one point he had concerns that the worker may never be able to perform with her right arm the work she had performed with that arm before the injury. In addition, the company did not present evidence indicating that it offered light-duty work within the worker's restrictions or any reasonable accommodations to the worker at any time after February 22, 1999. Accordingly, we find no error.

Whether the Trial Court Erred by Ordering the Company to Pay the Worker's Past and Future Medical Benefits
The company argues that the trial court erred by ordering the company to pay the worker's past and future medical benefits because she did not express dissatisfaction with the company-approved physicians or request a panel of four additional physicians from which to choose. Ala.Code 1975, § 25-5-77(a). The company is correct in contending that, generally, it "is not liable for medical or surgical treatment obtained by the [worker] without justification or notice to the [company]." Combustion Eng'g, Inc. v. Walley, 541 So.2d 560, 561 (Ala.Civ.App.1989). However, the company may be liable if the worker was justified in not obtaining the company's authorization before receiving treatment. Walley, 541 So.2d at 561. The courts of this state have determined that a worker in justified in not obtaining pretreatment authorization from the company in the following instances:
"(1) where the [company] has neglected or refused to provide the necessary medical care, (2) where notice of and request for alternative care would be futile, and (3) where other circumstances *858 exist which justify the selection of alternative care by the [worker]."
Id.
In Walley, this court was faced with a situation similar to that presented in this case. The company in Walley had informed the worker that it would not authorize certain treatment because it contended that the treatment was not related to the work-related injury. Id. The trial court determined that the company was liable for the expenses of the questioned treatment. Id. On appeal, this court affirmed the judgment ordering the company to pay those expenses, noting that the company had refused to authorize treatment based upon its position that the treatment was unrelated to the work-related injury. Id.
Likewise, this court has stated that a worker "may avail himself of medical services if the [company] has expressly or impliedly conveyed to the [worker] the impression that the [worker] is authorized to go to a physician of the [worker's] choosing...." Blue Bell, Inc. v. Nichols, 479 So.2d 1264, 1267 (Ala.Civ.App.1985); see also Sunnyland Foods, Inc. v. Catrett, 395 So.2d 1005, 1008 (Ala.Civ.App.1980) (affirming a judgment requiring the company to pay medical expenses after authorizing the worker to see a physician of his choosing). In Catrett, the trial court determined that the company's representative had informed the worker that he could see any physician he wished to consult for treatment of his work-related injury. Catrett, 395 So.2d at 1007. Because the company had "effectively transferred its authority to choose the doctor to [the worker]," the company could not complain that the medical expenses incurred were unauthorized. Id. at 1008.
We conclude that the evidence in this case, like that in Walley and Catrett, supports the trial court's judgment requiring the company to pay the worker's medical expenses. We find it rather disingenuous for the company to argue that the worker should be punished because she failed to request authorization for medical treatment of an injury the company had already determined was not work-related. Even more striking is that the company is now complaining after it informed the worker that she was to see her personal physician for further treatment. The trial court has determined that the worker's injury is work-related and is compensable. The company cannot now argue that the cost of the worker's medical care should not be borne by it on the basis that the worker failed to seek authorization or failed to use a company-approved physician. The trial court's judgment ordering payment of the worker's medical expenses is affirmed.

Whether the Trial Court Erred in Determining the Worker's Average Weekly Wage for the Period Between November 21, 1999, to November 21, 2000
The company argues that the trial court improperly calculated the worker's average weekly wage for the period between November 21, 1999, and November 21, 2000, by including in that wage the value of the worker's fringe benefits, which she continued to receive during that period. The trial court calculated the worker's average weekly wage during that period to be $514.50, which included $85.29 in fringe benefits. However, the worker received her fringe benefits during this period, so her average weekly wage during this period was $429.21. The worker concedes this error. Accordingly, the trial court's determination of the worker's average weekly wage for the period must be reversed, and the cause remanded for the trial court to properly calculate the benefits due the worker based on the proper average weekly wage.

*859 Whether the Trial Court Erred by Failing to Properly Calculate the LumpSum Attorney Fee Awarded

The company argues that the trial court failed to make a finding concerning the worker's age, failed to reference the mortality tables contained in Ala.Code 1975, § 35-16-3, and failed to reduce to present value the worker's future benefits so as to properly compute the lump-sum attorney fee it awarded. The trial court, when awarding a lump-sum attorney fee, must first reduce to present value the periodic future payments due the worker. See Ex parte St. Regis Corp., 535 So.2d 160, 162 (Ala.1988). A review of the trial court's judgment makes clear that the trial court failed to calculate the amount of future benefits the worker was due, failed to reduce that amount to its present value, and failed to calculate the lump-sum attorney fee award. Because the trial court is required to calculate the lump-sum attorney fee by first reducing the worker's award to present value, we must reverse that portion of the judgment making the attorney-fee award, and instruct the trial court on remand to properly calculate the future benefits the worker is due based upon her life expectancy, to reduce that amount to its present value, and to then calculate the lump-sum attorney fee due.

Conclusion
After reviewing the conflicting evidence presented to the trial court, we affirm the trial court's judgment insofar as it assigned 100% permanent total disability to the worker. However, the trial court erred in computing the worker's average weekly wage for the period between November 21, 1999, and November 21, 2000. In addition, the trial court erred in failing to calculate the worker's future benefits, in failing to reduce those benefits to present value, and in failing to properly calculate the lump-sum attorney fee award based on those calculations. Accordingly, the trial court's judgment is reversed, and the cause is remanded for a proper calculation of the benefits due the worker and the attorney fee.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED WITH INSTRUCTIONS.
YATES, P.J., and PITTMAN, J., concur.
MURDOCK, J., concurs in part and concurs in the result in part.
THOMPSON, J., concurs in the result only.
MURDOCK, Judge, concurring in part and concurring in the result in part.
I concur in all respects with the main opinion, with the exception of the last two sentences of that section of the main opinion titled "Whether the Worker's Injury Was to a Scheduled Member." 871 So.2d at 855. I agree with the main opinion that "an injury to the shoulder is not an injury to the arm," and therefore concur in the result reached in that section. I would not base that result, as does the main opinion, on the additional point that "the worker sought, and was awarded, benefits for permanent total disability." 871 So.2d at 855 (emphasis added). Even if the trial court's award had been for permanent partial disability, the trial court would not necessarily have been limited to awarding the compensation due under § 25-5-57(3)(a) for the loss of an arm. Moreover, it is the extent of disability, and whether that disability extends beyond the scheduled member, that defines whether a disability is total or partial, not vice versa.
NOTES
[1] Other descriptions of the worker's accident included statements in medical records that she was pulling a barrel, that she was pushing a barrel, or that she was moving a pallet. Although the company makes much of these somewhat inconsistent descriptions, we find that the thrust of all the descriptions is that the worker was performing the duties of her job when she was injured.