Werner Company ("the employer") appeals from a judgment of the Calhoun Circuit Court awarding Edward Randall Davidson ("the employee") permanent-total-disability benefits under the Alabama Workers' Compensation Act, § 25-5-1 et seq., Ala. Code 1975 ("the Act"). We affirm.
 Procedural History
On May 13, 2004, the employee filed a two-count complaint against the employer. The first count asserted a claim for workers' compensation benefits on account of a December 1, 2003, accidental injury to the employee's back. The second count sought damages for retaliatory discharge under Ala. Code 1975, § 25-5-11.1. The employer filed an answer on June 18, 2004. On February 1, 2005, the employer filed a motion for a partial summary judgment on the retaliatory-discharge claim. The trial court dismissed count two on March 21, 2005, based on the employee's motion for a voluntary dismissal.
Following ore tenus proceedings on September 6, 2006, the trial court entered its final judgment on October 23, 2006. By a separate order entered that same day, the trial court adopted the proposed findings of fact and conclusions of law submitted by the employee's attorney. Those findings of fact and conclusions of law indicated, among other things, that the parties had stipulated that the only disputed issue for trial was the extent of the employee's disability. The findings of fact and conclusions of law further stated that the employee was permanently and totally disabled as a result of his December 1, 2003, back injury. In its order adopting those findings and conclusions, the trial court stated:
 "The Court is of the opinion that due to the [employee's] injury and resulting damage to his back, . . . his disability is substantial and fixed. The Court is further of the opinion that there is no reasonable expectation that the [employee] is employable or will become employable in the competitive job market with his education, training, experience and medical condition. This is compounded by the necessity for the use of strong narcotic and narcotic-like drugs necessary to manage the [employee's] pain." *Page 457 
However, the findings of fact and conclusions of law did not contain any reference to the employee's need for narcotic or narcotic-like medications to manage his pain. The employer filed a motion to alter, amend, or vacate the judgment or, in the alternative, for a new trial on November 17, 2006. The trial court denied that motion on January 30, 2007. The employer filed its notice of appeal on February 26, 2007.
 Issues
The employer argues that the record does not contain substantial evidence indicating that the employee's back condition was medically caused by his work-related accident. The employer also argues that the record does not contain substantial evidence indicating that the employee's work-related accident resulted in his being permanently and totally disabled.
 Standard of Review
In a workers' compensation action, "[i]n reviewing pure findings of fact, the finding of the circuit court shall not be reversed if that finding is supported by substantial evidence." Ala. Code 1975, § 25-5-81(e)(2). "Substantial evidence" is `"evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.'" Ex parteTrinity Indus., Inc., 680 So.2d 262, 268 (Ala. 1996) (quoting West v. Founders Life Assurance Co. ofFlorida, 547 So.2d 870, 871 (Ala. 1989), in turn citing Ala. Code 1975, § 12-21-12(d)).
 Facts
At the time of the trial, the employee was a 39-year-old high-school graduate who was residing in Anniston. He had attended six months of community college and had worked for two employers since graduating from high school in 1985. He first worked for three years as a ware-houseman for Chalk Line, Inc. In October 1987, he began working for the employer; he worked for the employer until February 2004. The employer builds ladders. For the first three months of his employment with the employer, the employee worked as a general laborer. For the next 16 years, he worked in the extrusion department; he worked the first 10 years as a press operator and the final 6 years as a maintenance mechanic. The employee described his job duties as being very physically demanding.
On December 1, 2003, the employee felt a catch in the lower left side of his back while swinging a 10- to 12-pound sledge-hammer as part of his work duties. After resting for 10 minutes, the employee attempted to again swing the sledgehammer, and again he felt a catch in his back, only this time he could not straighten up. The employee immediately reported the injury to his supervisor and then reported to the health and safety department. After filling out an accident report at the employer's request, the employee visited Dr. W. Louis Stokes.
The employee testified that Dr. Stokes examined him and told him that he had strained his back muscles. Dr. Stokes prescribed pain medication and muscle relaxants for the employee and scheduled him for physical therapy. The employee attempted physical therapy the next day, but, according to the employee, the therapist discharged him at that time back to the care of Dr. Stokes. On December 16, 2003, Dr. Stokes ordered an MRI of the employee's lumbar spine; the MRI was performed on December 29, 2003. The MRI showed a small central disk protrusion at the L5-S1 level that was slightly more prominent on the left. Dr. Robert Eichelberger, the radiologist who read the *Page 458 
MRI, wrote in his report that he believed the MRI did not look clinically significant but that it might be misleading because of the employee's positioning during the test. Based on this MRI, Dr. Stokes referred the employee to a neurosurgeon, Dr. Randall George, for surgical evaluation.
The employee testified that Dr. George performed a cursory examination and concluded that the employee suffered from mechanical low-back pain. Dr. George did not offer any medication or treatment other than returning the employee to work on light duty and informing the employee that he would simply have to live with his back pain. At that time, according to the employee, he was experiencing burning in his left hip and numbness and tingling in his left leg. Dr. George's report indicates that he diagnosed the employee with mechanical low-back pain along with a small central disk protrusion with dessication at the L5-S1 disk. Dr. George instructed the employee regarding isometric back-strengthening exercises, a daily walking program, and proper posture and lifting habits, and he gave the employee a back belt and prescribed medication, including Ultram and Parafon Forte. Dr. George noted in his records that he would see the employee again on an as-needed basis.
The employee did not believe that Dr. George had adequately examined him, so he requested to see another doctor. The employer's representative agreed to furnish the employee a panel of four doctors from which he could select a new physician. See § 25-5-77(a), Ala. Code 1975. A "couple of weeks later" the employee received the panel of four doctors and selected Dr. Dewey Jones III.
The employee first saw Dr. Jones on February 18, 2004. Dr. Jones indicated that he wanted the employee to submit to a myelogram and EMG studies. The employee testified that the employer's workers' compensation insurance carrier submitted the request for a myelogram to a review procedure and that the request was originally denied; however, after Dr. Jones corresponded with the carrier for "a month or two," the carrier eventually approved the procedure.
After the accident, the employee had been working light duty. In February 2004, while awaiting approval of the myelogram, the employee was informed that he had been released to full duty. A few days later, the employer informed the employee that it intended to have a general reduction in force. The employer offered the employee a job in which he would be earning $7 to $8 per hour less than he was earning in his mechanic position. The employee testified that he was concerned that he could not physically perform the offered position and that he wanted to wait until after an upcoming medical appointment to decide whether to accept the job. According to the employee, the employer gave him 24 hours to accept or decline the offer. The employee went to the doctor the next day. The employee testified that, by the time he talked to human resources, he had already been discharged.
The employee underwent the myelogram on May 20, 2004. By that time, according to the employee's trial testimony, in addition to the persistence of his earlier symptoms, the employee's left leg had begun "giving out," causing him to fall down several times. The employee testified that the myelogram showed a pinched nerve. Dr. Jones's records indicate that the myelogram was inconclusive. Dr. Jones ordered epidural steroid blocks to address the employee's numbness and other left-leg symptoms. In addition, Dr. Jones prescribed narcotic pain medication, nerve stimulants, and muscle relaxants for the employee. By June 28, 2004, Dr. Jones felt that the employee had reached *Page 459 
maximum medical improvement and that he could be released to some kind of light or limited work. Dr. Jones's records indicate that he diagnosed the employee with mechanical low-back pain and that that pain had resulted in the employee's having a 5% permanent impairment.
The employee returned to Dr. Jones in September 2004 with complaints of persistent pain around his left hip and buttock. Dr. Jones ordered a morphine block. The employee testified that the morphine prompted an allergic reaction; however, Dr. Jones's records indicate that the employee had no adverse reaction to the procedure. The morphine block did not alleviate the employee's symptoms; the employee testified that his symptoms actually worsened. However, the employee did not return to see Dr. Jones for two months.
In November 2004, the employee returned to Dr. Jones with complaints of pain in his lower back, left hip, left buttock, and left leg. Dr. Jones concluded that the employee was not a surgical candidate at that time and decided, instead, that he needed to be treated conservatively with work restrictions and medication. By December 16, 2004, Dr. Jones had ordered a repeat MRI to determine if the employee's lumbar condition had progressed since his May 2004 myelogram. An MRI performed on January 6, 2005, showed an L5 disk abnormality that Dr. Jones believed could be generating the employee's left-sided pain. At that point, Dr. Jones recommended back surgery.
The employee testified that because of his symptoms and side effects caused by his medications — Darvocet, Percocet, Flexeril, Cymbalta, Robaxin, and Mobic — he was not able to work while being treated by Dr. Jones. The employee testified that his medications did not give him any relief, they simply knocked him out. However, at some point, the employee worked for his stepmother's bingo parlor for two or three weeks, answering the telephone. According to the employee, he lost that job because he could not be relied on to stay seated; he was replaced by a secretary.
The employee eventually underwent an L5-S1 laminectomy and diskectomy on January 31, 2005. Following the surgery, Dr. Jones took the employee completely off work, had the employee undergo physical therapy between February 2005 and May 2005, and prescribed a TENS unit for his back. The employee testified that his back has not improved.
On June 15 and 16, 2005, the employee submitted to a functional capacities evaluation ("FCE"). The FCE report indicated that the employee could perform work in the medium category of the labor market, with the exception of waist to overhead lifting and left-hand carrying; however, the therapist indicated that the employee's work capability depended in large part on management of the employee's pain and discomfort on a daily basis. The employee informed Dr. Jones on June 17, 2005, that the FCE had made his back and leg pain worse. Originally, Dr. Jones confirmed the findings in the FCE report; however, on July 20, 2005, Dr. Jones indicated that he disagreed with the pain assessment in the FCE report and felt that the employee could "only do some sedentary work."
Dr. Jones followed the employee for the next 10 months. Dr. Jones referred the employee to Dr. Thomas Kraus for pain management. The employee did not improve despite a series of epidural steroid injections. A repeat MRI showed scar tissue at the surgical site, but Dr. Jones did not recommend another surgery. On February 28, 2006, the employee indicated that he had been taking up to 16 Darvocet pills a day and inquired of Dr. Kraus as to what other medications or treatments *Page 460 
were available for him. Dr. Kraus stated in his report that before he would consider prescribing long-acting opiate therapy or implanting a spinal-cord stimulator, he wanted the employee to undergo a psycho-logical evaluation by Dr. Daniel Doleys, a pain-management specialist. At that point, according to Dr. Kraus's notes, the workers' compensation insurance carrier took the position that Dr. Jones had referred the employee to Dr. Kraus solely for epidural steroid injections and not for further treatment, and the employer did not authorize the referral to Dr. Doleys.
After the surgery and other medical treatment failed, the employee became depressed and emotional. He visited a mental health counselor approximately a dozen times. The counselor recommended that the employee visit his family doctor about getting a prescription for medication for treatment of anxiety and depression. The employee's family doctor prescribed Celexa, which the employee said "takes the edge off some, but doesn't help . . . all the time."
At the time of the trial, the employee had not seen Dr. Doleys, even though Dr. Jones had agreed with Dr. Kraus's recommendation that the employee undergo a psychological evaluation. The employee testified that the employer's workers' compensation insurance carrier had informed him to go to the emergency room if he needed any treatment, which the employee did a few times. The employee tried to return to Dr. Kraus, but the doctor would not see him because the employer's workers' compensation insurance carrier refused to pay for the visit. The employee saw Dr. Jones one additional time, on July 24, 2006, and the doctor prescribed him Ultram, a narcotic-like pain medication, and Flexeril, an anti-inflammatory medication.
The employee testified at trial that his back was not any better. The employee stated that his pain now extends all the way across the lower part of his back into his right side and into his right hip. He testified that, typically, he does not do anything all day. At one point he was helping to care for his mentally disabled uncle, but he had stopped doing that by the time of trial. He testified that he is able to walk down to his father's house, which is 50 yards from his house. He testified that he has constant pain, with the pain being worse on some days than on others. He also testified that some days his pain is so bad that he cannot eat and he vomits. He testified that he can only sleep or sit for an hour or two at a time and that when he awakes or arises from sitting, he is real stiff. He testified that he constantly alternates between sitting, standing, and laying down, and that his legs sometime give out on him. He testified that he can drive, but only short distances, and that his 15-year-old daughter often drives him from Anniston to Birmingham, Montgomery, or Alabaster, but that they have to stop two or more times so he can get out of the car and walk around to relieve his stiffness. He testified that some days he tries to exercise and walk.
The employee also testified that he did not feel he was capable of doing any kind of work. The employee stated that he did not know that Dr. Jones had released him to sedentary duty. The employee testified that he had sought employment in the mechanical field through an uncle, his former supervisor, and the state employment office, but that he had not found employment. The employee had not sought any assistance from the state employment office regarding vocational retraining.
Russ Gurley, a licensed professional counselor and a vocational consultant, testified *Page 461 
that, based on Dr. Jones's restrictions limiting the employee to sedentary work, the employee was unable to perform his past trade as a maintenance mechanic and that the restriction also precluded the employee from performing his past jobs as a warehouseman and press operator. Gurley opined that, when coupled with Dr. Kraus's recommendation that the employee enroll in a pain-treatment program, indicating the employee had intractable pain, the employee's restrictions precluded him from obtaining any employment in his relevant labor market. Gurley also testified that, even if he did not consider the employee's pain issue, and considered only the sedentary-work restriction, the employee did not have access to any suitable jobs in his relevant labor market. Gurley further testified that, because of his pain problem, the employee was not a suitable candidate for vocational retraining.
Margaret Sandlin, a licensed professional counselor, testified that she had tested the employee and had found him to have below-average intelligence. She computed his vocational-disability rating based on two scenarios. First, assuming the FCE correctly placed the employee into the medium category of work, she determined that the employee had sustained a 30% vocational disability. Second, assuming Dr. Jones intended to limit the employee to light duty, and not sedentary duty, she determined that the employee had sustained a 58% vocational disability. Sandlin testified that she had located 9 to 10 jobs that were available in the employee's relevant labor market that she considered suitable for the employee based on his age, work restrictions, aptitudes, intelligence, and work history. Sandlin also testified that the employee was a suitable candidate for vocational retraining.
 Analysis
The employer initially argues that the employee failed to meet his burden of proving medical causation, i.e., that his December 1, 2003, injury contributed to his permanent back condition. See Ex `parte Valdez, 636 So.2d 401, 404
(Ala. 1994) ("`To establish medical causation, the employee must show that the . . . exposure to conditions was, in fact, a contributing cause of [the employee's] injury.'" (quotingEx parte Price, 555 So.2d 1060, 1062 (Ala. 1989))). Specifically, the employer asserts that the employee failed to adduce sufficient evidence, consisting of expert medical testimony, to prove that his December 1, 2003, accident contributed to his chronic back pain. See Lambert v.Lisanti Foods, Inc., 624 So.2d 625, 627 (Ala.Civ.App. 1993) (holding that, in the absence of supporting expert testimony, plaintiffs subjective belief that employment activities caused back problems did not sufficiently prove medical causation); and King v. Vermont American Corp., 664 So.2d 214, 217
(Ala.Civ.App. 1994) (accord).
However, as the employee notes in his brief to this court, at the outset of the trial, the employer's attorney stipulated that the only issue to be tried was "the permanency of the injury, the degree of the impairment." The employer's attorney further stated on the record that the employer admitted several other issues, including that the employee had sustained an "on-the-job injury." When the parties stipulate to an issue of fact in open court, no further evidence is required on the point. See City of Montgomery v. Casper,849 So.2d 966, 969 (Ala.Civ.App. 2002) (testimony of employer's risk manager that employer conceded it owed employee some amount of workers' compensation benefits for some degree of permanent disability constituted stipulation that employee suffered work-related injury, obviating need to prove medical causation). Accordingly, *Page 462 
we reject the employer's contention that the employee failed to offer sufficient evidence of medical causation.[1]
The employer next argues that the record does not support some of the findings leading the trial court to conclude that the employee is permanently and to-tally disabled. Permanent total disability is defined as the inability to perform one's trade and the inability to find and be re-trained for gainful employment. Mead Paper Co. v. Brizendine,575 So.2d 571, 574 (Ala.Civ.App. 1990); Ala. Code 1975, § 25-5-57(a)(4)d. Before a finding of permanent total disability can be made, the employee must prove not only that his disability prevents his return to his former occupation, but that other suitable employment is unavailable and retraining is not feasible. Red Mountain Constr. Co. v. Neely,627 So.2d 931, 934-35 (Ala.Civ.App. 1992). The employer contends that the trial court erred in finding: (1) that the employee's ability to find other employment is adversely affected by "the necessity for the use of strong narcotic and narcotic-like drugs necessary to manage the [employee's] pain" and (2) that the employee is not eligible for retraining "at this time because of his pain syndrome and his need for long-term pain management."
The record shows, in fact, that at the time of the trial the employee had not taken any narcotic pain medication since at least February 2006 when Dr. Kraus cut off such medication pending a psychological evaluation by Dr. Doleys. The employee testified that, before that time, he was using large dosages of narcotic medication, which would render him unconscious and unable to work. Dr. Jones prescribed the employee Ultram and Flexeril in late July 2006. Ultram is a narcotic-like pain reliever. The employee did not present any evidence indicating that the use of those medications would impair his ability to find work.
However, we note that the trial court did not incorporate the factual findings relating to the effect of the employee's medication on his ability to find work into its final judgment. The findings of fact in the final judgment mention medication only in concluding that the employee's treatment had not effectively controlled his pain and other symptoms. Hence, any factual error in the prejudgment order regarding the employee's medication does not appear to have affected the trial court's conclusion that the employee was permanently and totally disabled.
The record also indicates that, in fact, the employee was not actively involved in a long-term pain-management program. The evidence indicates only that Dr. Kraus believed the employee might be a candidate for a long-term pain-management program and that Dr. Kraus and Dr. Jones had referred the employee to Dr. Doleys for evaluation as to the appropriate pain-management program. However, at best, the trial court's misstatement constitutes harmless error. See Rule 45, Ala. R.App. P. The employee's vocational expert testified that it was the employee's intractable pain that prevented him from undergoing vocational rehabilitation. The employee's vocational expert testified that he considered Dr. Kraus's referral to Dr. Doleys for an evaluation as an indication that Dr. Kraus believed the employee had intractable pain. The employee's vocational expert did not indicate that a referral to a *Page 463 
long-term pain-management program alone prevented retraining.
In James River Corp. v. Franklin, 840 So.2d 164, 168
(Ala.Civ.App. 2002), this court noted that a trial court had made several factual errors regarding the medical testimony and that several of the trial court's subordinate factual findings were, therefore, incorrect. However, this court concluded that those misstatements amounted to harmless error because the record as a whole supported the ultimate factual determination that the employee was permanently and totally disabled.Id. Likewise, in Werner Co. v. Williams,871 So.2d 845, 853 (Ala.Civ.App. 2003), this court held that, in reviewing findings of fact, the duty of this court is to determine whether "the ultimate finding made by the trial court is supported by substantial evidence," so any failure by the trial court to fully and accurately summarize the whole of the evidence does not amount to reversible error.
In this case, the record contains substantial evidence supporting a finding that, as a result of his back injury, the employee was unable to return to his trade as a maintenance mechanic, was unable to return to work in any of his former occupations, was unable to obtain other suitable gainful employment, and was unable to be retrained for other suitable gainful employment. The employee testified that his pain prevents him from normally sleeping, standing, sitting, walking, or laving down for prolonged periods, and that it prevents him from driving long distances. The employee's vocational expert testified that the work restrictions placed on the employee by his doctors alone rendered the employee unemployable. The employee's vocational expert also testified that the employee's pain rendered him an unsuitable candidate for retraining. Consequently, any minor factual errors made by the trial court in its findings of fact do not warrant reversal.
Finally, we address the employer's argument that the trial court erred in awarding the employee permanent-total-disability benefits based on a finding that the employee was not a suitable candidate for vocational retraining "at this time." The employer contends that the use of the phrase "at this time" indicates that the evidence regarding the feasibility of vocational rehabilitation was inconclusive or incomplete at the time of trial. In Neely, supra, this court rejected a similar argument that the use of the phrase "at this time" indicated that the employee had sustained only a temporary, as opposed to a permanent, disability. 627 So.2d at 934. This court noted that the overall substance of the trial court's judgment indicated that the trial court had considered the employee to be both presently and permanently disabled.Id. However, in this case, the remainder of the trial court's judgment does not indicate that it considered the employee to be permanently ineligible for vocational rehabilitation. The trial court's failure to find the employee to be permanently unsuitable for vocational rehabilitation does not constitute reversible error, however.
As stated above, the test for permanent total disability includes proof that "`retraining is not feasible.'"Neely, 627 So.2d at 935 (quoting Mead Paper Co. v.Brizendine, 575 So.2d at 574). Because the portion of the test relating to vocational rehabilitation is phrased in the present tense, it is apparent that the suitability of the employee for vocational rehabilitation is to be determined as of the time of the judgment. This reading comports with the language of the statute, which indicates that an employee is permanently and totally disabled when he is "permanently and totally incapacitate[d] . . . from working *Page 464 
at and being retrained for gainful employment." Ala. Code 1975, § 25-5-57(a)(4)d. Moreover, the legislature obviously envisioned that an employee could be considered permanently and totally disabled based on a present, although temporary, inability to engage in vocational rehabilitation. In § 25-5-57(a)(4)b. and § 25-5-57(a)(4)h., Ala. Code 1975, the Act provides a mechanism by which a permanent-total-disability award may be set aside on the ground that vocational rehabilitation has reduced or ended the employee's disability. The reference to vocational rehabilitation in these provisions has effect only if an employee who is receiving permanent-total-disability benefits, i.e., an employee who has been found at one time to be unsuitable for vocational rehabilitation, later becomes capable of vocational rehabilitation. Hence, the trial court's use of the phrase "at this time" in relation to the employee's ability to be retrained does not require reversal of its judgment.
AFFIRMED.
THOMPSON, P.J., and PITTMAN, BRYAN, and THOMAS, JJ., concur.
[1] We likewise reject any contention that the trial court erred in failing to make an express finding of medical causation in its final judgment. The trial court need not make findings of fact on stipulated issues. See Henderson v.Johnson, 49 Ala.App. 191, 197, 269 So.2d 905, 910 (Civ. 1972).