PER CURIAM.
 

 Advantage Sales of Alabama, Inc. (“Advantage”), PMA Insurance Group (“PMA”), and Liberty Mutual Insurance Company (“Liberty”) appeal from a judgment of the Jefferson Circuit Court finding Carol S. Clemons to be permanently and totally disabled as a result of injuries she sustained in the line and scope of her employment and apportioning liability for the payment of benefits as a result of those injuries. This is the second time that this case has been before this court.
 
 See Advantage Sales of Alabama, Inc. v. Clemons,
 
 979 So.2d 114 (Ala.Civ.App.2007)(“CZemo«s
 
 I
 
 ”). In
 
 Clemons I,
 
 we set forth the following relevant procedural history:
 

 “Carol S. Clemons sued her former employer, Advantage Sales of Alabama, Inc. (‘Advantage), seeking to recover workers’ compensation benefits based on alleged work-related injuries that she sustained on June 20, 2000, February 23, 2001, and March 26, 2002, while she was employed by Advantage. Clemons claimed that she had injured her right shoulder on June 20, 2000, that she had developed carpal tunnel syndrome in her right arm and wrist on February 23, 2001, and that she had sustained injuries to her elbows on March 26, 2002. Advantage answered and denied liability.
 

 “At the time of the June 20, 2000, and the February 23, 2001, injuries, Advantage was insured by Legion Insurance Company (‘Legion’). On March 28, 2002, Legion was ordered into rehabilitation by a Pennsylvania trial court. On July 28, 2003, the Pennsylvania trial court declared Legion insolvent and en
 
 *520
 
 tered an order of liquidation. As a result of Legion’s insolvency, the Alabama Insurance Guaranty Association (‘AIGA’) assumed Legion’s obligations with respect to Clemons’s June 20, 2000, and February 23, 2001, claims against Advantage.
 
 See
 
 § 27-42-8(a)(2), Ala. Code 1975. On February 23, 2004, Clemons and Advantage entered into a consent order settling all workers’ compensation claims related to Clemons’s June 20, 2000, injury to her shoulder and Clemons’s February 23, 2001, injury to her right arm and wrist. The order left the issue of future medical benefits open.
 

 “On March 21, 2005, Clemons filed her first amended complaint in which she alleged that in or about July 2004 she developed carpal tunnel syndrome in both of her hands and wrists. Clemons named Liberty Mutual Insurance (‘Liberty5) and The PMA Insurance Group (‘PMA’) as defendants and asked the court to determine which carrier was responsible for the payment of Clemons’s workers’ compensation claims.
 
 [1]
 
 Both Liberty and PMA were workers’ compensation insurance carriers for Advantage during the time Clemons allegedly suffered her injuries. On June 1, 2005, Clemons amended her complaint a second time to add AIGA as a defendant because, she asserted, she was uncertain whether the carpal tunnel syndrome she alleged had developed in or about July 2004 was a recurrence of her February 2001 injury or was a new injury.
 

 “On August 23, 2005, AIGA filed a motion for a summary judgment, and on October 12, 2005, PMA filed a motion for a summary judgment. On January 24, 2006, the trial court entered a summary judgment in favor of AIGA; the trial court did not rule on PMA’s summary-judgment motion. Following the presentation of ore tenus evidence, the trial court entered a detailed final judgment on May 24, 2006, in which it found Clemons to be permanently and totally disabled as the result of her work-related injuries. The trial court apportioned the payment of compensation benefits equally between Liberty and PMA. On June 14, 2006, Advantage appealed.
 

 “On June 21, 2006, PMA filed a post-judgment motion in which it argued that the trial court had erred in apportioning liability between successive insurance carriers in violation of the ‘last injurious exposure’ rule. On August 1, 2006, the trial court entered an amended final judgment in which it granted PMA’s postjudgment motion, found Clemons’s July 2004 injury to be a new injury or condition that occurred during Liberty’s policy coverage, and reapportioned liability to hold Liberty responsible for payment of Clemons’s medical bills related to the July 2004 injury. PMA and Liberty timely appealed. This court granted a joint motion filed by Advantage, PMA, and Liberty to consolidate the three appeals.
 

 Clemons I,
 
 979 So.2d at 115-17 (one footnote omitted).
 

 In
 
 Clemons I,
 
 the trial court relied on evidence indicating that Clemons suffered from depression when it found Clemons to be permanently and totally disabled. The issue whether Clemons’s depression was a compensable psychological injury was not raised in the pleadings or expressly or impliedly tried by the parties. Therefore, this court reversed the judgment of the trial court based on the trial court’s consideration of evidence of a psychological injury. We remanded the case for the
 
 *521
 
 trial court to make a disability determination without considering Clemons’s claim of depression. 979 So.2d at 119.
 

 On remand, the trial court entered an order on October 16, 2007, in which it found Clemons to be permanently and totally disabled as the result of her work-related injuries. In its October 16, 2007, judgment on remand, the trial court noted that, in making its judgment, it had reconsidered the ore tenus evidence with the exception of the evidence pertaining to Clemons’s depression. The trial court’s allocation of liability between PMA and Liberty for the payment of benefits remained unchanged. Advantage, PMA, and Liberty timely appealed. We have consolidated the appeals.
 

 The evidence presented to the trial court reveals the following pertinent facts. At the time of the final hearing, Clemons was 52 years old and had a high school education. In or about May 1986, Clemons began working for Advantage as a retail sales representative. Clemons explained that as a retail sales representative she distributed new items to grocery stores and made sure that those items were properly placed on the grocery-store shelves. Clemons explained that the physical demands of her job required her to lift products on and off of store shelves. Clemons testified that she handled a wide range of items that included peanut butter, margarine, and large bags of dog food.
 

 In 1992 Clemons was promoted to a supervisor position. Clemons testified that as a supervisor she continued to perform many of the same duties but also supervised the work of others in Alabama, Georgia, and Mississippi. After working nine years as a supervisor, Clemons returned to her job as a retail sales representative due to restructuring within the company. Clemons worked as a retail sales representative until February 8, 2005.
 

 Over the course of her employment with Advantage, Clemons sustained several work-related injuries. Clemons testified that in June 2000 she hurt her right shoulder while reshelving pet food in a grocery store. Clemons was eventually released to return to work with limited restrictions. Clemons’s claim for workers’ compensation benefits for her June 2000 shoulder injury was resolved by a February 23, 2004, consent judgment that left open future medical expenses associated with Clemons’s shoulder injury. In February 2006, Dr. Jeffery Davis performed surgery on Clemons’s shoulder. Clemons was released to return to work from that surgery approximately one week before the trial in this matter.
 

 Clemons testified that after she injured her right shoulder she experienced consistent pain in both of her arms. Clemons went to Dr. Tracy Ray for treatment of the pain in her arms. Dr. Ray referred Clemons to Dr. Marcus Carter to conduct tests to determine if Clemons had carpal tunnel syndrome. In or around March 2001, after conducting tests on her arms, Dr. Carter diagnosed Clemons with bilateral carpal tunnel syndrome. Clemons testified that Dr. Carter decided that Clemons’s right hand needed immediate surgery. Dr. Joseph Sherrill performed surgery in May 2001 on Clemons’s right wrist and gave her a splint to wear on her left hand. Clemons testified that she later returned to work performing her same job duties. Clemons’s claim for workers’ compensation benefits as a result of her carpal tunnel syndrome was resolved by a February 23, 2004, consent judgment.
 

 Clemons testified that on March 26, 2002, while performing her job duties, she hit her right elbow on a wooden pallet. That same day, Clemons notified her su
 
 *522
 
 pervisor of the injury and sought treatment at a hospital emergency room. Clemons received treatment for the injury to her elbow from Dr. Cherie Miner, who treated Clemons conservatively. Clemons explained that she later developed pain in her left elbow as the result of overcompensating for her injured right elbow. Clemons described the pain in her elbows as severe and testified that she was unable to sleep as a result of the pain. Clemons stated that she continued to work during this time.
 

 Dr. Miner referred Clemons to Dr. Samuel Goldstein, an orthopedic surgeon, when it appeared that conservative treatment would no longer work. Clemons testified that Dr. Goldstein performed surgery on her right elbow in July 2002 and later performed surgery on her left elbow in October 2002. On April 8, 2003, Dr. Gold-stein concluded that Clemons had reached maximum medical improvement (“MMI”) with regard to her elbow injuries.
 

 A functional-capacity evaluation (“FCE”) performed on Clemons by Dr. Roland Rivard on March 20, 2003, was admitted into evidence at trial. The FCE recommended work restrictions that included lifting no more than 36 pounds and lifting no more than 25 pounds on a frequent basis. Further, the FCE stated that Clemons was not able to perform “handling” in a continuous repetitive fashion but that she could handle items for two-thirds of an eight-hour shift.
 
 [1]
 
 Clemons testified that the restrictions set forth in the FCE remained in place at the time of trial.
 

 Clemons testified that she returned to work as a retail sales representative on September 22, 2003, after she recovered from the surgeries to her elbows. According to Clemons, she worked six-hour days when she returned to work. Clemons stated that it was difficult to perform her job duties when she returned to work.
 

 In July 2004, Clemons returned to Dr. Goldstein, complaining of pain in her arms. Dr. Goldstein diagnosed Clemons with mild bilateral carpal tunnel syndrome. Clemons testified that she underwent conservative treatment, and on February 8, 2005, Dr. Goldstein ordered her to stop working. On January 25, 2006, Dr. Gold-stein concluded that Clemons had reached MMI.
 

 Clemons testified that she experiences pain in her arms and hands daily and that she is no longer capable of cleaning her home or working in the yard. Clemons explained that she experiences numbness in her arms if she holds a telephone for an extended period of time or if she sleeps on her arms the wrong way. Clemons testified that her hands cramp and her arms hurt when she grips the steering wheel of her vehicle. Clemons explained that she has trouble sleeping at night because of the pain in her arms and hands. Clemons estimated that she sleeps less than four hours a night. Clemons testified that she has managed the pain by taking Bextra, an anti-inflammatory prescription medication, and ibuprofen, a pain reliever, and by applying a topical cream to her elbows. Clemons also uses slings, hand braces, and a transcutaneous electrical nerve stimulation (“TENS”) unit to manage her pain. The record indicates that Clemons had been prescribed Percocet for pain related to her shoulder injury.
 

 Clemons testified that the pain in her arms and hands at the time of trial was greater than the pain she experienced in
 
 *523
 
 2003, when Dr. Rivard conducted the FCE. At the time of trial, no other FCE had been conducted. Clemons testified that she did not believe that she could return to work performing the same job duties as she did in September 2003. Clemons stated that she spoke to Advantage on April 7, 2006, regarding job availability and that Advantage had no jobs available that she could physically perform.
 

 Julia Bailey, a retail sales merchandiser employed by Advantage, testified that she worked with Clemons from September 2003 to February 2005. Bailey testified that during that time she observed that it was difficult for Clemons to reach over her head and lift heavy objects. Bailey testified that Clemons found it difficult to move shelves and products. Bailey stated that Clemons asked for her assistance moving shelves and heavier items. Bailey described the job she and Clemons performed as strenuous. Clemons explained that it required lifting items as light as 3 pounds and as heavy as 50 or 60 pounds.
 

 Dr. Goldstein testified by deposition that he first met with Clemons on June 24, 2002, to evaluate Clemons’s right and left elbows. According to Dr. Goldstein, his physical examination of Clemons revealed lateral epicondylitis, also known as tennis elbow, in her right and left elbows. On July 10, 2002, Dr. Goldstein performed surgery on Clemons’s right elbow, and on October 31, 2002, he performed surgery on Clemons’s left elbow. Dr. Goldstein testified that at a March 31, 2003, postoperation visit he recommended that Clemons lift no more than 36 pounds and that she lift no more than 25 pounds frequently. Dr. Goldstein also advised Clemons not to perform continuous, repetitive activities. Dr. Goldstein assigned a 3% impairment rating to the body as a whole based on Clemons’s injury to her elbows.
 

 On July 20, 2004, Dr. Goldstein treated Clemons, who, at that time, complained of bilateral wrist and arm pain. Dr. Gold-stein testified that his examination of Clemons at that time revealed symptoms consistent with carpal tunnel syndrome. Dr. Goldstein diagnosed Clemons with carpal tunnel syndrome and prescribed Cele-brex. Dr. Goldstein testified that Clemons continued to complain of bilateral arm and wrist pain at her August 17, 2004, followup appointment. According to Dr. Gold-stein, his physical examination of Clemons during the follow-up appointment revealed that her right wrist remained unchanged with regard to her carpal tunnel syndrome and that her left wrist had improved. Dr. Goldstein replaced Clemons’s prescription for Celebrex with a prescription for Bex-tra.
 

 Dr. Goldstein testified that at a September 28, 2004, appointment, Clemons reported that the pain in her right wrist was less severe while the pain in her left wrist was more severe. According to Dr. Gold-stein, compression tests on Clemons’s right and left wrists were positive for carpal tunnel syndrome. Dr. Goldstein opined that Clemons continued to suffer from bilateral carpal tunnel syndrome. Clemons returned to see Dr. Goldstein on March 8, 2005, and continued to complain of severe wrist pain. Following an electro-myogram and nerve-conduction studies, Clemons met with Dr. Goldstein on April 5, 2005. Dr. Goldstein testified that the results of the electromyogram and nerve-conduction studies were consistent with mild carpal tunnel syndrome. Dr. Gold-stein explained that he did not recommend surgery based on Clemons’s mild case of carpal tunnel syndrome.
 

 According to Dr. Goldstein, the work activities that Clemons was exposed to after her May 2001 surgery, which was intended to relieve the carpal tunnel syn
 
 *524
 
 drome in her right wrist, contributed to her condition when she sought treatment for bilateral wrist pain in 2004. Dr. Gold-stein testified that he believed that Clemons’s 2004 complaint of pain in her right and left wrists was “a recurrent problem, which was an exacerbation of a prior problem.”
 

 Dr. Goldstein testified that Clemons’s 2002 elbow injuries were separate and distinct from her carpal tunnel syndrome. Dr. Goldstein explained that the pain Clemons experiences from the lateral epi-condylitis in her elbows and the pain Clemons feels from the bilateral carpal tunnel syndrome are “very different.”
 

 Dr. Goldstein testified that given the requirements of Clemons’s job at Advantage and her history of carpal tunnel syndrome and epicondylitis, it was not advisable for Clemons to continue performing the same type of work. Dr. Goldstein testified that if Clemons were to seek employment, she should seek employment in a vocation that does not require repetitive work. According
 
 to
 
 Dr. Goldstein, any repetitive activity could exacerbate Clemons’s carpal tunnel syndrome.
 

 Jo Spradling, a vocational consultant hired by Clemons, testified by deposition. Spradling met with Clemons on July 30, 2004, and on December 20, 2004. Spra-dling opined that Clemons could perform work at a sedentary level. However, based on the results of academic achievement tests administered to Clemons, Clemons’s employment history, Clemons’s medical history, Clemons’s age, and the March 20, 2003, FCE, Spradling opined that Clemons was 100% vocationally disabled. According to Spradling, there were no jobs for which Clemons was qualified in a competitive labor market given her age, her educational background, her below-average scores on the academic achievement tests, her inability to perform repetitive-type activities, and her chronic pain. Spradling testified that she did not believe that Clemons could be vocationally retrained.
 

 Advantage submitted as evidence a report by Russ Gurley, a vocational consultant, who conducted a vocational evaluation of Clemons on October 22, 2004, at Advantage’s request. Citing the March 20, 2003, FCE, Clemons’s medical records, and Clemons’s employment history, Gurley concluded that Clemons sustained a 10% to 20% vocational loss as a result of her injuries. In addition to the report, Advantage submitted a copy of a March 27, 2006, letter from Gurley to Advantage regarding a second meeting Gurley had with Clemons on March 14, 2006. In his March 27, 2006, letter, Gurley opined that Clemons continued to have a 10% to 20% vocational disability “based on her ability to work within the restrictions recommended by the FCE that limited Ms. Clemons’s handling activities.”
 

 In its October 16, 2007, judgment on
 
 remand,
 
 the trial court, noting this court’s mandate not to consider Clemons’s claim seeking workers’ compensation benefits based, in part, on her depression, made the following pertinent findings of fact:
 

 “50. The evidence is undisputed that, before [Clemons’s] work-related injuries with [Advantage], she was an active woman who has worked her entire life and the Court finds credible [Clemons’s] testimony that if she could work she would prefer to work.
 

 “51. Since her work-related injuries, [Clemons] has progressively become saddled with pain and an inability to perform some of the simple tasks that basic living requires.
 

 “52. The Court is especially impressed with the credibility of [Clemons]. Her physical appearance at trial, personal demeanor, voice inflection,
 
 *525
 
 forthrightness of response on the witness stand, sincerity of expression, congeniality, and modesty were observed carefully by the Court in connection with the content of her testimony.
 

 “53. In addition to what already has been set forth hereinabove, [Clemons] gave testimony that the Court found compelling, to the end that she is totally disabled from gainful employment and permanently in that condition.
 

 “54. By stipulation, the Court received into evidence the reports of each party’s vocational expert and the deposition testimony of [Clemons’s] expert. [Clemons’s] expert, Jo Spradling, who reviewed all of [Clemons’s] pertinent medical records, opined that [Clemons] was permanently and totally disabled from any competitive employment, and that she is not able to maintain the persistence, pace of work and attendance necessary for any type of competitive employment. The Court finds Ms. Spradling’s opinion to be most consistent with the medical testimony and other current evidence of [Clemons’s] inability to work in gainful employment.
 

 “55. On the issue of the relative degree of [Clemons’s] disability from engaging in reasonably gainful employment, the Court is persuaded in finding that the disability is total, and that the disability is permanent. During the trial, the Court availed itself of the opportunity to observe the demeanor of [Clemons], to observe the movements and mannerisms of [Clemons], and to listen to the inflection and tone of her voice. ...
 

 “56. The Court finds that Defendant PMA Insurance Group was the workers’ compensation insurance carrier for [Advantage] from May 1, 2001, until June 30, 2004.
 

 “57. The Court finds that Defendant Liberty Mutual was the workers’ compensation insurance carrier for [Advantage] beginning June 30, 2004, until June 30, 2005.
 

 “58. The Court finds that [Clemons’s] bi-lateral carpal tunnel condition, diagnosed on July 20, 2004, is a new injury or an aggravation, rather than a reoccurrence of the February 23, 2001, and/or March 26, 2002, work related injuries.
 

 “59. The Court finds that [Clemons’s] carpal tunnel condition contributes to [her] overall disability.”
 

 Our standard of review in workers’ compensation cases is as follows:
 

 “When this court reviews a trial court’s factual findings in a workers’ compensation case, those findings will not be reversed if they are supported by substantial evidence. § 25-5-81(e)(2), Ala.Code 1975. Substantial evidence is ‘evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.’
 
 West v. Founders Life Assurance Co. of Florida,
 
 547 So.2d 870, 871 (Ala.1989). Further, this court reviews the facts ‘in the light most favorable to the findings of the trial court.’
 
 Whitsett v. BAMSI, Inc.,
 
 652 So.2d 287, 290 (Ala.Civ.App.1994), overruled on other grounds,
 
 Ex parte Trinity Indus., Inc.,
 
 680 So.2d 262 (Ala.1996). This court has also concluded: ‘The [1992 Workers’ Compensation] Act did not alter the rule that this court does not weigh the evidence before the trial court.’
 
 Edwards v. Jesse Stutts, Inc.,
 
 655 So.2d 1012, 1014 (Ala.Civ.App.1995). However, our review as to purely legal issues is without a presumption of correctness.
 
 See Holy Family Catholic School v. Boley,
 
 
 *526
 
 847 So.2d 371, 374 (Ala.Civ.App.2002) (citing § 25-5-81(e)(l), Ala.Code 1975).”
 

 Reeves Rubber, Inc. v. Wallace,
 
 912 So.2d 274, 279 (Ala.Civ.App.2005).
 

 On appeal, Advantage contends that the trial court erred by awarding benefits outside of the schedule of benefits listed in § 25-5-57(a)(3), Ala.Code 1975, of the Workers’ Compensation Act, § 25-5-1 et seq., Ala.Code 1975, and that even if the trial court properly awarded benefits outside of the schedule, the evidence presented to the trial court does not support a finding that Clemons suffered a permanent and total disability as a result of her March 26, 2002, injury to her elbows and her July 20, 2004, diagnosis of carpal tunnel syndrome.
 

 Section 25-5-57(a)(3) provides, in pertinent part:
 

 “a. Amount and Duration of Compensation. For permanent partial disability, the compensation shall be based upon the extent of the disability. In cases included in the following schedule, the compensation shall be
 
 66%
 
 percent of the average weekly earnings, during the number of weeks set out in the following schedule:
 

 [[Image here]]
 

 “24. For the loss of two arms, other than at the shoulder, 400 weeks.
 

 “25. For the loss of two hands, 400 weeks.
 

 [[Image here]]
 

 “c. Concurrent Disabilities. If an employee sustains concurrent injuries resulting in concurrent disabilities, he or she shall receive compensation only for the injury which entitled him or her to the largest amount of compensation, but this paragraph shall not affect liability for the concurrent loss of more than one member for which members compensation is provided in the specific schedule.
 

 “d. Loss of Use of Member. The permanent and total loss of the use of a member shall be considered as equivalent to the loss of that member, but in such cases the compensation specified in the schedule for such injury shall be in lieu of all other compensation, except as otherwise provided herein. For permanent disability due to injury to a member resulting in less than total loss of use of the member not otherwise compensated in the schedule, compensation shall be paid at the prescribed rate during that part of the time specified in the schedule for the total loss or total loss of use of the respective member which the extent of the injury to the member bears to its total loss.”
 

 In
 
 Ex parte Drummond Co.,
 
 837 So.2d 831 (Ala.2002), our supreme court addressed the application of § 25-5-57(a)(3), stating:
 

 “In
 
 Bell v. Driskill,
 
 282 Ala. 640, 213 So.2d 806 (1968), this Court established an exception that removes certain injuries from the workers’ compensation schedule. This Court held in
 
 Bell:
 

 “ ‘[Ajlthough the injury itself is to only one part or member of the body, if the effect of such injury extends to other parts of the body, and produces a greater or more prolonged incapacity than that which naturally results from the specific injury, or the injury causes an abnormal and unusual incapacity with respect to the member, then the employee is not limited in his recovery under the [Workers’] Compensation Law to the amount allowed under the schedule for injury to the one member.’
 

 “282 Ala. at 646, 213 So.2d at 811. ...
 

 [[Image here]]
 

 “... Specifically, the
 
 Bell
 
 test permitted an injury to a scheduled member to be compensated outside the schedule if
 
 *527
 
 the effect of the injury extends to other parts of the body
 
 and
 
 produces a greater or more prolonged incapacity than that which naturally results from the injury to the specific member.”
 

 837 So.2d at 833-34.
 

 After quoting the exception set forth in
 
 Bell,
 
 the court in
 
 Ex parte Drummond
 
 renewed its commitment to the policy underlying the
 
 Bell
 
 test. 837 So.2d at 834. Quoting 4 Lex K. Larson,
 
 Workers’ Compensation Law
 
 § 87.02 (2001), the supreme court concluded:
 

 “ ‘The great majority of modern decisions agree that, if the effects of the loss of the member extend to other parts of the body and interfere with their efficiency, the schedule allowance for the lost member is not exclusive.’
 

 “(Footnote omitted.) This language remains unchanged from the edition of the Larson treatise on which this Court relied in
 
 Bell.
 
 Because of the confusion that has developed surrounding the
 
 Bell
 
 test, we today adopt the language recited above from Larson,
 
 Workers’ Compensation Law
 
 § 87.02, as the test for determining whether an injury to a scheduled member should be treated as unscheduled; therefore, we overrule
 
 Bell
 
 insofar as it established a different test ....”
 

 Ex parte Drummond,
 
 837 So.2d at 834-35 (footnote omitted).
 

 In
 
 Ex parte Drummond,
 
 our supreme court recognized that its holding in
 
 Drum-mond
 
 was consistent with its 1969 decision in
 
 Leach Manufacturing Co. v. Puckett,
 
 284 Ala. 209, 224 So.2d 242 (1969), wherein the court held:
 

 “[Wjhere there is an injury resulting in the loss of a member, or the loss of the use of a member, so as to invoke payment of compensation as provided [by the Workers’ Compensation Act], and where this is not accompanied by other physical disability (of the body), the payment of the specified sum is intended to fully compensate the injured employee for the injury sustained.”
 

 Puckett,
 
 284 Ala. at 214, 224 So.2d at 247.
 

 In its October 16, 2007, judgment, the trial court concluded that Clemons was permanently and totally disabled. Based on that conclusion, the trial court, citing dicta in
 
 Werner Co. v. Williams,
 
 871 So.2d 845 (Ala.Civ.App.2003), found that it did not have to determine whether the injury was scheduled or nonscheduled because, it reasoned, § 25-5-57(a)(3)a. only applies to permanent partial disabilities. The trial court concluded that Clemons was permanently and totally disabled without regard for whether the
 
 Drummond
 
 test had been satisfied.
 

 The trial court’s reliance on dicta in
 
 Werner Co. v. Williams,
 
 supra, is misplaced. Our supreme court’s decisions in
 
 Puckett
 
 and
 
 Drummond
 
 dictate that the trial court must first determine whether the permanent injury to the scheduled member extends to and interferes with other nonscheduled parts of the employee’s body. If the injury to the scheduled member does not extend to other parts of the employee’s body, then the injury is classified as a matter of law as a permanent partial disability and the schedule set forth in § 25-5-57(a)(3) governs the amount of compensation due the employee without consideration of any vocational disability.
 
 Swift Lumber, Inc. v. Ramer,
 
 875 So.2d 1200, 1205 (Ala.Civ.App.2003). If the evidence does meet the
 
 Drummond
 
 exception, the employee may present evidence of a vocational disability so as to recover benefits under either § 25-5-57(a)(3)(g)(governing compensation for nonscheduled permanent partial disability)
 
 *528
 
 or § 25-5-57(a)(4)a. (governing compensation for permanent total disability).
 

 In
 
 Alabama Workmen’s Compensation Self-Insurers Guaranty Association, Inc. v. Wilson,
 
 993 So.2d 451 (Ala.Civ.App.2006), the employer appealed the trial court’s judgment finding the employee permanently and totally disabled. In
 
 Wilson,
 
 the employee sustained injuries to his right and left wrists when a ladder on which he was working gave way and fell onto a concrete floor. As a result of his injuries, the employee required surgery on his right wrist and his left wrist was placed in a cast. Following his first surgery, the employee underwent a second surgery to his right wrist and underwent treatment on his left hand and wrist. The employee’s primary treating physician testified by deposition that the employee’s injuries and symptoms were limited to his two “ ‘upper extremities’ and ‘do not extend to or include any other part of the body.’”
 
 Wilson, 993
 
 So.2d at 454. The employee testified that he felt pain that extended to his hands and wrists and that he relieved that pain with several prescription medications as well as over-the-counter analgesic and anti-inflammatory medications. The employee testified that his nightly sleep had been reduced from seven or eight hours to three or four hours. Vocational experts hired by the employee and the employer testified that the employee’s disabilities were limited to his arms from the elbow down and that no evidence indicated that the employee’s injuries extended to or impaired some other part of the employee’s body.
 
 Wilson,
 
 993 So.2d at 455.
 

 In its judgment finding the employee permanently and totally disabled, the trial court determined that “ ‘the effects of injuries to [the employee’s] wrists extend to other parts of his body ... and interfere with their efficiency.’ ”
 
 Wilson,
 
 993 So.2d at 452. On appeal, this court reversed the judgment of the trial court and concluded that the injuries sustained by the employee were to scheduled members and that, therefore, the employee was entitled to benefits based upon a permanent partial disability to scheduled members, i.e., two arms.
 
 Wilson,
 
 993 So.2d at 455. In so holding, this court, citing
 
 Stone & Webster Construction, Inc. v. Lanier,
 
 914 So.2d 869 (Ala.Civ.App.2005), noted that “[a]ny interference with the function of both of the employee’s
 
 arms
 
 is of no legal import given that a loss of both arms is itself a scheduled injury.” 993 So.2d at 455. This court also recognized that more than a partial incidental sleep loss would be required to take an injury to a scheduled member outside the scope of the scheduled compensation. 993 So.2d at 455.
 

 In
 
 Shoney’s, Inc. v. Rigsby,
 
 971 So.2d 722 (Ala.Civ.App.2007), the employer appealed an award of workers’ compensation benefits to the employee based on a finding of a permanent and total disability arising from carpal tunnel syndrome. In
 
 Rigsby,
 
 the employee had worked for the employer for almost 30 years as a kitchen “prep” worker and a “kitchen manager.” 971 So.2d at 724. The employee’s job duties required the constant use of her hands and required her to lift as much as 50 pounds. Complaining of pain and numbness in her hands, the employee sought medical treatment and was diagnosed as having “trigger thumb” that caused her left thumb to pop and lock up, carpal tunnel syndrome in her right wrist, and tendinitis in her left wrist.
 
 Id.
 
 The employee received cortisone shots and later underwent carpal-tunnel-release surgery on her right wrist. The employee returned to work but continued to experience pain and numbness in her hands and wrists. The employee subsequently quit her job with the employer as a result of the pain in her hands and wrists. The
 
 *529
 
 employee testified that she could do some housework, drive on occasion, and shop for groceries but that her hands hurt if she did too much. The employee further testified that she took pain medication because of the pain in her hands and wrists.
 

 On appeal, the employer contended, among other things, that the trial court had erred by finding the employee permanently and totally disabled when the employee’s injury was solely to her right hand and/or right arm, both scheduled members under § 25-5-57(a)(3). Citing the test set forth in
 
 Ex parte Drummond,
 
 this court agreed with the employer that the trial court had erred by treating the employee’s injury as an unscheduled injury to the body as a whole rather than as a scheduled injury. In so holding, this court concluded that “the record ... does not reveal substantial evidence indicating that pain from [the employee’s] injuries ‘extends to other parts of [her] body and interferes with their efficiency so as to warrant a recovery of benefits outside the schedule.” 971 So.2d at 727. Further, we noted that the employee’s pain was largely precipitated by the use or overuse of the scheduled member and “ ‘[i]n such a case, the worker, by refraining from the use of that member, may largely avoid the pain in question with the result being that the worker is in no worse a position due to [her] inability to use the affected member than if the member had been completely lost.’ ”
 
 Rigsby,
 
 971 So.2d at 726-27 (quoting
 
 Masterbrand Cabinets, Inc. v. Johnson,
 
 984 So.2d 1136, 1144 (Ala.Civ.App.2005)).
 

 In the instant case, Clemons, who was diagnosed with lateral epicondylitis and mild carpal tunnel syndrome, testified that she experiences pain in her arms and hands daily and that the pain in her arms and hands has adversely effected her everyday activities. Clemons further testified that her sleeping habits had changed and that she slept only four hours a night. Clemons explained that she managed her pain by taking both prescription medication and over-the-counter medication. Clemons stated that she also used slings, hand braces, and a TENS unit to manage her pain.
 

 Clemons offered limited testimony at the final hearing regarding how the pain in her arms and hands extended to other parts of her body and interfered with their efficiency. Clemons testified that her injuries had adversely affected her sleep; however, as noted by this court in
 
 Wilson,
 
 supra, more than a partial incidental sleep loss is necessary to take an injury to a scheduled member outside the scope of the scheduled compensation. Clemons also presented lengthy testimony regarding depression she claimed to have suffered as a result of her physical injuries. However, this court previously held in
 
 Clemons I
 
 that the trial court had erred when it considered evidence of Clemons’s depression, and in
 
 Clemons I
 
 we instructed the trial court to make a disability determination without considering Clemons’s claim of depression. 979 So.2d at 121.
 

 Based on the foregoing and the authority of
 
 Shoney’s, Inc. v. Rigsby,
 
 supra, we conclude that the trial court erred by awarding Clemons benefits based on an injury to the body as a whole rather than by awarding benefits based on the loss of use of a scheduled member. The judgment of the trial court, insofar as it awards Clemons permanent-total-disability benefits outside the schedule set out in § 25-5-57(a)(3), is reversed, and the case is remanded for the trial court to enter an appropriate award of permanent-partial-disability benefits pursuant to the schedule.
 

 In their appeals, PMA and Liberty both contend that the trial court erred in its
 
 *530
 
 application of the “last injurious exposure” rule. In its October 16, 2007, judgment, the trial court found as follows regarding the application of the “last injurious exposure” rule:
 

 “Because [Clemons] suffered multiple and distinct injuries during her employment with [Advantage] and because [Advantage] changed workers’ compensation insurance carriers periodically, this Court finds it necessary to apply the last injurious exposure rule in resolving which insurance carrier is now responsible for paying workers’ compensation benefits to [Clemons].
 

 “Because this Court has concluded that [Clemons’s] carpal tunnel condition [diagnosed on July 20, 2004,] is a new or aggravated condition and occurred during Liberty Mutual’s policy period, [Liberty] is liable for [Clemons’s] medical bills related to that condition and all disability payments [Clemons] is entitled to from July 20, 2004.”
 

 The trial court ordered PMA, Advantage’s insurer at the time of Clemons’s March 26, 2002, injury to her elbows, to pay Clemons temporary-total-disability benefits that had accrued from April 13, 2003, to September 23, 2003. The trial court further ordered PMA to pay Clemons temporary-partial-disability benefits that had accrued from September 23, 2003, to July 20, 2004, at which time Clemons was diagnosed with bilateral carpal tunnel syndrome. The trial court ordered Liberty, Advantage’s insurer at the time Clemons was diagnosed with bilateral carpal tunnel syndrome, to pay Clemons temporary-partial-disability benefits from July 20, 2004, when Clemons was diagnosed with bilateral carpal tunnel syndrome, to February 8, 2005. The trial court further ordered Liberty, as Advantage’s insurance carrier at the time of Clemons’s last injury, to pay all of Clemons’s permanent-total-disability benefits dating from January 24, 2006. The trial court also ordered PMA to cover all the medical benefits relating to Clemons’s treatment of her elbow injuries and ordered Liberty to cover all the medical benefits relating to Clemons’s treatment of her carpal tunnel syndrome.
 

 In
 
 North River Insurance Co. v. Purser,
 
 608 So.2d 1379 (Ala.Civ.App.1992), this court adopted the “last injurious exposure” rule when determining the liability of insurance carriers in “successive injury” cases.
 

 “Under the ‘last injurious exposure’ rule, ‘liability falls upon the carrier covering [the] risk at the time of the most recent injury bearing a causal relation to the disability.’
 
 North River Insurance Co. v. Purser,
 
 608 So.2d 1379, 1382 (Ala.Civ.App.1992). The trial court must determine whether the second injury is ‘a new injury, an aggravation of a prior injury, or a recurrence of an old injury; this determination resolves the issue of which insurer is liable.’
 
 Id.
 

 “A court finds a recurrence when ‘the second [injury] does not contribute even slightly to the causation of the [disability].’ 4 A. Larson,
 
 The Law of Workmen’s Compensation,
 
 § 95.23 at 17-142 (1989). ‘[T]his group also includes the kind of case in which a worker has suffered a back strain, followed by a period of work with continuing symptoms indicating that the original condition persists, and culminating in a second period of disability precipitated by some lift or exertion.’ 4 A. Larson, § 95.23 at 17-152. A court finds an ‘aggravation of an injur/ when the ‘second [injury] contributed independently to the final disability.’ 4 A. Larson, § 95.22 at 17-141. If the second injury is characterized as a recurrence of the first injury, then the first insurer is responsible for the medical bills; however, if the injury is consid
 
 *531
 
 ered an aggravation of the first injury, then it is considered a new injury and the employer at the time of the aggravating injury is liable for the medical bills and disability payments.
 
 North River, supra.”
 

 United States Fid. & Guar. Co. v. Stepp,
 
 642 So.2d 712, 715 (Ala.Civ.App.1994).
 

 PMA contends that the trial court properly invoked the “last injurious exposure” rule but erroneously applied the rule by holding it responsible for “past owed temporary total disability benefits [and] temporary partial disability benefits” instead of assigning liability exclusively to Liberty. In its judgment, the trial court ordered PMA to pay temporary-total-disability benefits that had accrued from April 13, 2003, to September 23, 2003, and temporary-partial-disability benefits that had accrued from September 23, 2003, to July 20, 2004. The trial court further ordered Liberty to pay temporary-partial-disability benefits and permanent-total-disability benefits that had accrued after July 20, 2004.
 

 The trial court found that Clemons sustained a bilateral carpal-tunnel-syndrome injury on July 20, 2004. Therefore, any disability occurring before July 20, 2004, could not possibly be attributable to Clemons’s carpal tunnel syndrome, but must be attributable solely to Clemons’s elbow injuries. Because PMA was Advantage’s insurance carrier on the risk at the time of the last injury relating to the disability periods for which the trial court held PMA responsible, the trial court correctly assigned the responsibility for payment of any compensation for those periods to PMA. In light of the foregoing, we cannot say that the trial court erred in holding PMA responsible for the “past owed temporary total disability benefits [and] temporary partial disability benefits.”
 

 PMA further contends that the trial court erred by ordering it to pay all Clemons’s medical bills relating to her elbow injuries. PMA contends that the trial court should have assigned liability for Clemons’s workers’ compensation benefits exclusively to Liberty. In its October 16, 2007, judgment, the trial court found that Clemons’s July 20, 2004, carpal tunnel syndrome “is a new injury or an aggravation, rather than a reoccurrence of the February 23, 2001, and/or March 26, 2002, work-related injuries.” The evidence relating to that finding shows that Clemons first developed bilateral carpal tunnel syndrome on February 23, 2001. The left-sided carpal tunnel syndrome did not require surgery, but Clemons underwent surgery on her right wrist in May 2001. Dr. Gold-stein testified at length regarding the relationship between the 2001 carpal tunnel syndrome and the 2004 carpal tunnel syndrome. His testimony indicated that the right-sided carpal tunnel syndrome diagnosed in 2004 was a new injury and that the left-sided carpal tunnel syndrome diagnosed in 2004 was an aggravation of the 2001 condition. Dr. Goldstein’s testimony supports the trial court’s finding that the July 20, 2004, bilateral carpal tunnel syndrome was either a new injury or an aggravation of the February 23, 2001, carpal tunnel syndrome.
 

 Regarding the trial court’s finding that Clemons’s July 20, 2004, carpal tunnel syndrome was a new injury or an aggravation of her March 26, 2002, elbow injuries, the evidence presented to the trial court indicated that there was no causal relationship between Clemons’s 2004 carpal tunnel syndrome and her 2002 elbow injuries. Dr. Goldstein characterized Clemons’s lateral epicondylitis and carpal tunnel syndrome as “separate and distinct injuries.” Dr. Goldstein explained that the pain from carpal tunnel syndrome was
 
 *532
 
 “very different” from the pain from lateral epicondylitis. The record does not contain substantial evidence indicating that Clemons’s carpal tunnel syndrome contributed even slightly to the problems with her elbows. The record does not support the trial court’s conclusion that the 2004 carpal tunnel syndrome aggravated the 2002 elbow injuries. Given the undisputed evidence indicating that the March 23, 2002, injury is the only injury bearing a causal relationship to Clemons’s elbow problems, the trial court did not err in ordering PMA to pay the employee’s medical bills for the treatment of her elbow injuries.
 

 In support of its argument, PMA cites
 
 Health-Tex, Inc. v. Humphrey,
 
 747 So.2d 901 (Ala.Civ.App.1999). In
 
 Health-Tex, Inc. v. Humphrey,
 
 supra, the employee developed bilateral carpal tunnel syndrome while working for her first employer. After leaving her employment with the first employer and going to work for a second employer, the employee’s carpal tunnel syndrome returned. The employee sued both employers, seeking workers’ compensation benefits and alleging that she had sustained injuries in the line and scope of her employment with both employers. Following an ore tenus hearing, the trial court found that the employee had suffered an aggravation of her initial injuries while working for the second employer, and it ordered each employer to pay certain compensation benefits and certain medical expenses to the employee. 747 So.2d at 903. On appeal, the employers contended that the trial court had erred in its application of the “last injurious exposure” rule when it found that the employee suffered an aggravation to her condition during her employment with the second employer yet apportioned liability between the two employers. This court agreed and reversed the judgment of the trial court, holding that “[bjecause the record supports the trial court’s finding that the worker suffered an aggravation, the trial court should have ordered the second company to be solely liable for the worker’s compensation benefits.”
 
 Humphrey,
 
 747 So.2d at 905.
 

 Health-Tex, Inc. v. Humphrey,
 
 supra, is distinguishable from the case at bar. In
 
 Humphrey,
 
 the employee aggravated her preexisting bilateral carpal tunnel syndrome; the initial injury and the successive injury were identical. The aggravation to the employee’s bilateral carpal tunnel syndrome in
 
 Humphrey
 
 resulted in a single injury. In the instant case, the question of liability between insurance carriers is based on Clemons’s 2004 bilateral carpal tunnel syndrome — a cumulative stress injury — and her 2002 elbow injuries — an accidental injury. Both of the injuries at issue in this case are separate and distinct injuries.
 

 Liberty contends on appeal that the trial court erred in ordering it to be responsible for Clemons’s permanent-total-disability benefits. Given our holding that Clemons’s injuries fall within the schedule, and, therefore, that she is not entitled to permanent-total-disability benefits, we need not address Liberty’s contention on appeal. The trial court’s judgment ordering Liberty to pay permanent-total-disability benefits is reversed.
 

 In conclusion, we affirm the trial court’s judgment insofar as it orders PMA to cover Clemons’s medical bills for her elbow injuries and to cover the temporary-total-disability benefits awarded for the period from April 13, 2003, to September 23, 2003, and the temporary-partial-disability benefits awarded for the period from September 23, 2003, to July 20, 2004. We also affirm the trial court’s judgment ordering Liberty to pay Clemons’s medical bills relating to the treatment of her bilateral carpal tunnel syndrome and ordering Lib
 
 *533
 
 erty to pay temporary-partial-disability benefits for the period from July 20, 2004, to February 8, 2005. Because we are reversing the trial court’s award of permanent-total-disability benefits, that portion of the trial court’s judgment ordering Liberty to pay those benefits is due to be reversed.
 

 2070113 — REVERSED AND REMANDED WITH INSTRUCTIONS.
 

 2070160 — AFFIRMED.
 

 2070199 — AFFIRMED IN PART; REVERSED IN PART; AND REMANDED WITH INSTRUCTIONS.
 

 All the judges concur.
 

 [1]
 

 “1The record indicates that PMA insured Advantage at the time of Clemons's March 2002 injury and that Liberty became Advantage's workers' compensation insurance carrier in July 2004.”
 

 [1]
 

 . "Handling,” as referred to in the FCE, included seizing, holding, grasping, and turning objects.